| | |
|---|---|
| 1 | Ara Sahelian, Esq., [CBN 169257] |
| 2 | SAHELIAN LAW OFFICES |
| 3 | 25108 Marguerite pkwy, Ste A |
|   | Mission Viejo, CA  92692 |
| 4 | 949. 859. 9200 |
| 5 | e-mail: contact@sahelianlaw.com |
|   | Attorneys for Laura Lee Zuber |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**(Western Division - Los Angeles)**

Orlando Garcia,
        Plaintiff,
        vs.
Laura Lee Zuber,
in individual and representative capacity as trustee
        Defendants.

CASE NO.: 2:21-cv-00682-FMO-PVC
The Honorable Karen L. Stevenson

**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**Trial: 12/20/22**

# MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Mr. Orlando Garcia (Plaintiff) sued Ms. Laura Lee Zuber who owns property on which an auto repair shop (Alroga's) operates. Plaintiff filed the instant action on January 26, 2021, in relation to a property located at 2910 Florence Av., Huntington Park (hereinafter also, "Property"), asserting claims for "the Americans with Disabilities Act; the Unruh Civil Rights Act."

To set forth a prima facie case under Title III of the ADA, plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of his disability. *Arizona ex rei. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 670 (9th Cir. 2010). *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 953. (9th. Cir. 2011) (en banc). The ADA does not authorize private attorney general actions. It is not an open-ended private attorney general statute. *Chapman*, 631 F.3d 939, 953.

Under the ADA, aggrieved individuals "may obtain injunctive relief against public accommodations with architectural barriers, including 'an order to alter facilities to make such facilities readily accessible to and usable by

individuals with disabilities.'" 42 U.S.C. § 12188(a)(2)). Injunctive relief is proper where the plaintiff establishes that "architectural barriers at the defendant's establishment violate the ADA and the removal of the barriers is readily achievable." *Moreno v. La Curacao*, 463 F. App'x 669, 670 (9th Cir. 2011).

But even more importantly, for a plaintiff to allege Article III standing, he must sufficiently plead an (1) injury-in-fact, (2) that is causally connected to Defendant's challenged conduct, and (3) likely to be "redressed by a favorable decision." *Lujan*. at 560 -61. The alleged injury-in-fact must be: (1) "concrete and particularized" and (2) "actual or imminent, not 'conjectural' or 'hypothetical.'" Id, 560.

The requirements for Article III standing "are not mere pleading requirements but rather an indispensable part of a plaintiff's case. Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 561.

**Plaintiff should dismiss this action in light of his deposition testimony. Trial commences on December 20, 2022, and there is a great deal of work**

**to be done in preparing for trial which should be avoided.**

A review of the Complaint reveals that Mr. Garcia allegedly visited the repair shop "with the intention to avail himself of its services," (Complaint, ¶8). He also alleges he will "return to Alroga's Auto Repair to avail himself of its services...." (*Id*, ¶20).

As it turns out, Mr. Garcia had no intent to "avail himself of its services." Here is the relevant testimony from his deposition:

> "Q.· · How did you pick Alroga's?
> 13· · · · A.· · We were passing by.
> 14· · · · Q.· · Okay.· "We" were passing by?· Who's "we"?
> 15· · · · A.· · Me and my son.
> 16· · · · Q.· · Okay.· And when were you passing by?
> 17· · · · A.· · In August 2020.
> 18· · · · Q.· · Okay.· And were you scouting the neighborhood
> 19· ·for ADA compliance at the time?
> 20· · · · A.· · Well, that's something that's -- you know, I
> 21· ·was in the look -- you know, I'm looking for.· But I was 22· ·coming from the cleaners if there's what you're -- you're 23· ·asking.
> 24· · · · MR. SAHELIAN:· So I'm going to have the court
> 25· ·reporter reread the question." (Deposition of Garcia, 20; 13-25)
>
> "(The record was read as follows:
> ·2· · · · · · · "And were you scouting the neighborhood for
> ·3· · · · · · ADA compliance at the time?")
> ·4· · · · Q.· · BY MR. SAHELIAN:· It's either a yes or a no,

| | |
|---|---|
| 1 | 5·  Mr. Garcia. |
| 2 | 6·    A.·  I was coming from the -- the cleaners.· If I |
| 3 | 7·  see a -- if I see a violation, you know, I'm not going to |
| 4 | 8·  ignore it. |
| 5 | 9·    Q.·  All right.· What cleaners were you coming |
| 6 | 10·  from? |
| 7 | 11·    A.·  Jesse's Cleaners. |
| 8 | 12·    Q.·  Where are they located? |
| 9 | 13·    A.·  They are located on Atlantic, and I think |
| 10 | 14·  it's -- the cross street is on Elmwood. |
| 11 | 15·    Q.·  Atlantic and Elmwood? |
| 12 | 16·    A.·  Yeah. |
| 13 | 17·    Q.·  Jesse's Cleaners.· Is that on the way to |
| 14 | 18·  Alroga's? |
| 15 | 19·    MS. HEMMING:·  Objection, calls for speculation. |
| 16 | 20·       Go ahead, Mr. Garcia. |
| 17 | 21·    THE WITNESS:·  It's a little bit -- it's close to |
| 18 | 22·  there, you know.· On -- we went to pick up my cleaners, |
| 19 | 23·  and then we went, you know, down -- we went to Florence |
| 20 | 24·  and were passing by the -- the mechanic, so I asked him |
| 21 | 25·  to stop there." (Deposition of Garcia, 21; 1-25) |
| 22 | "Q.·  BY MR. SAHELIAN:·  And so was that because you |
| 23 | 2·  looked over as you were driving, and you thought you saw |
| 24 | 3·  ADA issues? |
| 25 | 4·    A.·  No.·  I didn't notice the parking till we |
| 26 | 5·  pulled in. |
| 27 | 6·    Q.·  All right.· So why did you stop there? |
| 28 | |

```
·7· · · A.· · To get a tune-up.
·8· · · Q.· · To get a tune-up.· At what time of the day was
·9· ·it?
10· · · A.· · I don't know.· It was about 4:30 or 5:00.
11· · · Q.· · In the afternoon?
12· · · A.· · Yeah.
13· · · Q.· · Well, I don't know what time you wake up,
14· ·Mr. Garcia, I have to ask.
15· · · A.· · I know.
16· · · Q.· · And were you looking to get a tune-up that
```
-2-
```
17· ·day?
18· · · A.· · I had been wanting to get one.· You know, I
19· ·just got the van.· I had it about a month, and I -- you
20· ·know, I -- I had been wanting to get a tune-up.· You
21· ·know?· So, you know, my -- my son took me, I think it was
22· ·his day off.· So I -- you know, we just try to take care
23· ·of business, you know?
24· · · Q.· · I see.
25· · · A.· · (Simultaneous dialog.)" (Deposition of Garcia, 22; 1-25)
```
"Q.· · And so is 4:30 in the afternoon, was it your
·2· ·objective to drop off the car right there and have it get
·3· ·tuned?
·4· · · A.· · Well, you know, I wanted to inquire about it
·5· ·and see how much they would charge, you know, and if --
·6· ·if, you know, if it was reasonable and, you know, we
·7· ·would do that.· You know?

·8· · · Q.· · All right.· And was it again your thought to

·9· ·wait for it to be done at that hour, 4:30 or five

10· ·o'clock?

11· · · A.· · I really didn't think about that." (Deposition of Garcia 23; 1-11)

"16 Q.· · Did you need a tune-up, yes or no?

17· · · A.· · I wanted to get one.

18· · · Q.· · But you have yet to get one; is that correct?

19· · · A.· · Yeah, I haven't got one yet, yeah.

20· · · Q.· · And it's been two years; correct?

21· · · A.· · Yes.

22· · · Q.· · So while you say you went there because you

23· ·were interested in getting a tune-up, here we are two

24· ·years later or thereabouts, you have yet to get a

25· ·tune-up, and the reason for that is what again, (Deposition of Garcia, 43;16 -25)

·1· ·Mr. Garcia?

·2· · · A.· · I don't plan on keeping the car." (Deposition of Garcia, 44; 1-2)

Clearly, Mr. Garcia's allegation that he will, "return to Alroga's Auto Repair to avail himself of its services" Id., ¶ 20 was a fabrication, as he testified he had no intention of keeping the car. In fact, it's been two years and he has yet to get a tune-up.

Plaintiff also testified that he did not own a vehicle in mid - 2020; that the only way for him to travel from his home to a business in 2020 would have

been to use public transportation - - as that would have been the only way to transport his wheelchair.

Lastly, Mr. Garcia does not drive:

> ·6· · · Q.· · ...Are you able to drive?
> ·7· · · A.· · No, not --.· I used to be.
> ·8· · · Q.· · Okay.· When did you stop driving?
> ·9· · · A.· · I don't know, about 20-something years ago.
> 10· · · Q.· · Was that because of an incident?· Why did you
> 11· ·stop driving?
> 12· · · A.· · Um, I don't know.· I just didn't -- I didn't
> 13· ·have a car, and I just -- you know, it was -- I got an
> 14· ·Access, yeah.· I don't like driving.
> 15· · · Q.· · Okay.· So you drove for, what, ten or 20 years
> 16· ·before you stopped?
> 17· · · A.· · I'm guessing so, yeah.· I started like in --
> 18· ·like in 1980, somewhere around there, like 30, '80 start
> 19· ·driving.

In sum, Mr. Garcia does not drive, he had no means to transport his wheelchair on the date of the incident, and he has not pursued getting a tune-up. By his own admission, Mr. Garcia has no Article III standing.

Respectfully submitted:

Date: 11/2/2022

SAHELIAN LAW OFFICES

_____
Ara Sahelian, Esq.